**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**April 17, 2025**

# In the Court of Appeals of Georgia

A25A0467. HOME EQUITY CREDIT SERIES 2021, LLC v. PATRICK LABAT, SOLEY IN HIS CAPACITY AS SHERIFF OF FULTON COUNTY.

MERCIER, Chief Judge.

In this interpleader action regarding excess funds generated by a tax sale, Home Equity Credit Series 2021, LLC, ("Home Equity Credit") appeals the trial court's determination that NewRez, LLC,[1] ("NewRez") and GHFA Affordable Housing, Inc. ("GHFA") were entitled to a portion of the excess funds as owners of security deeds encumbering the real property in issue. For the reasons set forth below, we affirm in part and reverse in part.

---

[1] NewRez also does business as Shellpoint Mortgage Servicing.

As is relevant here, the record shows that the Fulton County Sheriff conducted a tax sale of real property owned by Kelby Nelson on February 1, 2022. The sale generated excess funds in the amount of $438,598.95. Following the tax sale, NewRez, through its tax servicer, redeemed the property from the tax sale purchaser on Nelson's behalf,[2] and the tax sale purchaser quitclaimed title to the property back to Nelson.

To properly distribute the excess funds generated by the tax sale, the Sheriff initiated an interpleader action in accordance with OCGA § 48-4-5. In response to the interpleader petition, a number of parties made claims to the excess funds, including NewRez, GHFA, and Home Equity Credit. In its particular claim, NewRez contended that it was entitled to a portion of the excess funds because, at the time of the tax sale: (1) the Federal Home Loan Mortgage Corporation ("Freddie Mac") held a mortgage on the property with a $276,763.71 payoff amount that constituted a first priority security title interest and (2) NewRez was the loan servicer for Freddie Mac at that time. GHFA also

---

[2] The redemption price, $528,000, was paid by Corelogic Tax Services, LLC, a company employed by NewRez to manage tax payments.

made a claim for excess funds, stating that it held a deed to secure debt against Nelson's property with a mortgage payoff amount of $6,833.22. In addition, Home Equity Credit also claimed the excess funds, asserting that Nelson had assigned his right to the funds to it for collection. Following a hearing on the interpleader, the trial court, in relevant part, awarded $276,763.71 and $6,833.22 to NewRez and GHFA, respectively, based on their alleged security deeds.[3] No funds were ultimately awarded to Home Equity Credit, and it now takes issue with the awards made to NewRez and GHFA, arguing, among other things, that owners of deeds to secure debt encumbering property sold at a tax sale are not entitled to excess funds and that, in any event, NewRez failed to adequately prove its interest.

1. We first consider Home Equity Credit's argument that owners of security deeds have no right to excess funds generated by a tax sale. We find this contention to be unpersuasive.

The procedure for conducting a tax sale is settled.

All owners of non-exempt real and tangible personal property are subject to taxation on the property's fair market value as of January first of each

---

[3] After a hearing on the competing claims, the trial court also awarded $151,014.46 to Alice Hamilton, a judgment lienholder, and $3,987.56 to the Sheriff of Fulton County for his costs and attorney fees. These awards are not challenged.

year. In order to secure payment of these taxes when they fall delinquent, the law creates a lien which extends not only to the property giving rise to the tax obligation, but also to all other property owned by the taxpayer. Generally, a lien for delinquent ad valorem taxes arises at the time the taxes become due and unpaid, and covers all property in which the taxpayer has any interest from the date the lien arises until such taxes are paid. When taxes are not paid, the Tax Commissioner is authorized to issue a writ of fieri facias (or tax execution), which is a directive to the appropriate officer (often the sheriff) to levy upon the property, sell it and collect the unpaid taxes. Following a tax sale, after the payment of taxes, costs, and other expenses, any excess proceeds may be claimed by the parties entitled to receive them, including those who hold other liens against the property.

*Nat. Tax Funding v. Harpagon Co.*, 277 Ga. 41, 42 (1) (586 SE2d 235) (2003) (citations, punctuation, and footnote omitted).

Following such a tax sale, which is authorized under OCGA § 48-4-1 (a) (1),

the delinquent taxpayer or any other party holding an interest in or lien on the property may redeem the property by paying to the tax sale purchaser the purchase price plus any taxes paid and interest. If the property is redeemed, the tax sale is essentially rescinded and a quitclaim deed is executed by the tax sale purchaser back to the owner of the property at the time of levy and sale. If a creditor of the original taxpayer redeems the property, the amount paid by the redeeming creditor becomes a first lien on the property. The redeeming creditor then has first priority to repayment — a "super-lien" for the redemption price — and may proceed to foreclose against the property based upon that lien. This right of redemption, however, may be terminated by the tax sale purchaser anytime after one year following the tax sale. After that year has run, the tax sale purchaser may "terminate, foreclose, divest, and forever bar" all rights to redeem the property by giving notice under

4

OCGA § 48-4-40, et seq. ("the barment statutes") to all parties with redemption rights. The barment statutes apply to "all persons having . . . any right, title, or interest in, or lien upon" the subject property. However, until such time as the barment statutes are invoked once the one year redemption period has run, the tax sale purchaser's interest in the property is not exclusive, as the taxpayer and other lienholders retain their rights of redemption. A tax deed vests the purchaser with a defeasible (and, incidentally, taxable) fee interest in the property, but it does not entitle a purchaser to exclusive possession until the right of redemption is terminated.

*Nat. Tax Funding*, 277 Ga. at 42-43 (1) (citations and footnote omitted). See also OCGA § 48-4-40 (establishing the right to redeem real property); OCGA § 48-4-43 (granting redeemer of real property "first lien on the property" to be paid "prior to any other claims upon the property").

If a tax sale generates excess funds (in other words, more funds than necessary to pay the outstanding taxes and costs), an interpleader action may be initiated pursuant to OCGA § 48-4-5, which provides:

(a) If there are any excess funds after paying taxes, costs, and all expenses of a sale made by the tax commissioner, tax collector, or sheriff, or other officer holding excess funds, *the officer selling the property shall give written notice of such excess funds to the record owner of the property at the time of the tax sale and to the record owner of each security deed affecting the property and to all other parties having any recorded equity interest or claim in such property at the time of the tax sale.* Such notice shall be sent by first-class mail within 30 days after the tax sale. The notice shall

5

contain a description of the land sold, the date sold, the name and address of the tax sale purchaser, the total sale price, and the amount of excess funds collected and held by the tax commissioner, tax collector, sheriff, or other officer. *The notice shall state that the excess funds are available for distribution to the owner or owners as their interests appear in the order of priority in which their interests exist.*

(b) The tax commissioner, tax collector, sheriff, or other officer may file, when deemed necessary, an interpleader action in superior court for the payment of the amount of such excess funds. *Such excess funds shall be distributed by the superior court to the intended parties, including the owner, as their interests appear and in the order of priority in which their interests exist.* The cost of litigation of such an interpleader action, including reasonable attorney's fees, shall be paid from the excess funds upon order of the court.

(Emphasis supplied.) So, the interpleader provisions expressly contemplate the potential distribution of excess funds to "owners," which will be more fully discussed below.

The nature of the excess funds generated by a tax sale holds importance in determining their proper distribution. In *DLT List, LLC v. MM7VEN Supportive Housing and Dev. Group*, 301 Ga. 131, 135 (2) (800 SE2d 362) (2017) ("*DLT List II*"), our Supreme Court concluded that "excess funds from a tax sale are *personal* property that is separate and distinct from the real property itself." (Emphasis in original.) For this reason, a party claiming excess funds must necessarily prove some enforceable

6

right to personal property; a right that merely authorizes recourse against the real property underlying the tax sale is not enough to claim entitlement to excess funds. Id.

The ramifications of this holding have been considered and applied in several cases that are instructive, but ultimately not controlling, in the present matter. In *DLT List II*, it was held that a creditor who redeems property following a tax sale, and thereby receives a "super-lien" for the redemption price, is not entitled to excess funds based solely on that lien. Our Supreme Court explained:

> The plain language of OCGA § 48-4-40 permits the redemption of *real property*, and OCGA § 48-4-43 awards a priority lien to a redeeming creditor that is specific to the *real property* at issue; we are constrained by this language. See OCGA § 48-4-40 (establishing the right to redeem *real* property); OCGA § 48-4-43 (granting redeemer of real property "first lien on *the property*" to be paid "prior to any other claims *upon the property*").

*DLT List II*, 301 Ga. at 135 (2) (emphasis in original). Since the super-lien is specific to real property only, it may not be used as a basis to claim excess funds that comprise *personal* property.[4] Id.

---

[4] For this reason, NewRez cannot (and does not) claim entitlement to the excess funds based on the super-lien it holds as the creditor that redeemed Nelson's property.

In *Flat Creek Falls, LLC v. Labat*, 369 Ga. App. 90 (892 SE2d 188) (2023), we applied this same reasoning to demolition liens created under OCGA § 41-2-9 (a) (7). There, the City of Atlanta contended that it was entitled to excess funds from a tax sale because it held such a lien on the underlying real property. However, OCGA § 41-2-9 (a) (7) provides that:

> the amount of the cost of demolition, including all court costs, appraisal fees, administrative costs incurred by the . . . municipal tax collector or city revenue officer, and all other costs necessarily associated with the abatement action, including restoration to grade of the real property after demolition, shall be *a lien against the real property* upon which such cost was incurred.

(Emphasis supplied.) Given the holding in *DLT List II*, we held that "we cannot conclude that the City has a right to the excess tax funds, which are personal property, when the General Assembly has provided that the City's lien applies *only* to the real property." *Flat Creek Falls*, 369 Ga. App. at 94 (footnote omitted and emphasis supplied).

In *Jackson v. Wellington & Assoc.*, 389 FSupp3d 1199, 1210-1211 (III) (B) (ii) (N.D. Ga. 2019), the federal court expanded the holding of *DLT List II* even further, finding that an owner of a deed to secure debt on a tax sale property had no right to

8

excess funds generated by a tax sale based on the security deed. The federal court

reasoned:

> In Georgia, "if a property owner fails to pay . . . property taxes, the [taxing entity] may issue a writ of fieri facias and conduct a sale of the property to satisfy the unpaid taxes." [*DLT List, LLC v. MM7VEN Supportive Housing and Dev. Group*, 335 Ga. App. 318, 321 (779 SE2d 436) (2015) (*DLT List I*)] (citing OCGA § 48-4-1). The purchaser at the tax sale receives a tax deed, which "vests the purchaser with a defeasible . . . fee interest in the property which continues for . . . one year." Id. (citation omitted). During this year, the delinquent taxpayer or any other party holding an interest in or lien on the property may redeem the property by paying to the purchasers the purchase price plus any taxes paid and interest. Id. (citation omitted). "[I]f no one redeems the property, all the liens and ownership interests in the property existing prior to the tax sale are swept away at the close of the year, leaving the tax-sale purchaser with clear title to the property." Id. However, "[i]f the property is redeemed, the tax sale is essentially rescinded." *Nat. Tax Funding*, [277 Ga. at 42]. Thus, in the event of redemption, the existing liens on the property remain, as opposed to being wiped out after the redemption period expires.
>
> Here, it is undisputed that the property was redeemed in favor of [the original owner]. Thus, the liens that existed prior to the tax sale remain against the underlying real property. As such, [an] interest based on [a] Security Deed, which was attached to the property prior to the Tax Sale, remains on the Subject Property and does not attach to the excess funds.

*Wellington*, 389 FSupp3d at 1210-1211 (III) (B) (ii). Home Equity Credit now advances

this holding to support a contention that, because a security deed creates a real

9

property interest and not a personal property interest, the owner of a security deed has no claim to excess funds from a tax sale (and, for this reason, neither NewRez nor GHFA may claim the excess funds based on any alleged deeds to secure debt held by them).

As an initial matter, the holding of the federal court in *Wellington*, though persuasive, is not binding on this Court. See *Southstar Energy Svcs., LLC v. Ellison*, 286 Ga. 709, 713 (1) (691 SE2d 203) (2010) ("While we are at liberty to consider such authority, the appellate courts of this state are not bound by decisions of federal courts except the United States Supreme Court.") (citation and punctuation omitted). So, we consider the federal court's conclusion as informative, but we have no obligation to follow it. Id. Here, given the express wording of OCGA § 48-4-5, we are not persuaded by the federal court's determination.

In assessing the meaning and scope of OCGA § 48-4-5, we

> presume that the General Assembly meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage.

*Monumedia II, LLC v. Dept. of Transp.*, 343 Ga. App. 49, 51–52 (1) (806 SE2d 215) (2017) (citations and punctuation omitted). Accordingly, in order to determine whether the owner of a security deed may claim excess funds, we must begin with the plain text of the statute that delineates the classes of parties to whom excess funds must be made available and paid.

To that end, OCGA § 48-4-5 (a), the interpleader notice provision states, in relevant part:

> [T]he officer selling the property shall give written notice of such excess funds to *the record owner of the property* at the time of the tax sale and *to the record owner of each security deed affecting the property* and to all other parties having any recorded equity interest or claim in such property at the time of the tax sale. . . . *The notice shall state that the excess funds are available for distribution to the owner or owners* as their interests appear in the order of priority in which their interests exist.

(Emphasis supplied.) And, with regard to any interpleader action, OCGA § 48-4-5 (b) mandates that "excess funds shall be distributed by the superior court to the intended parties, *including the owner*, as their interests appear and in the order of priority in which their interests exist." (Emphasis supplied.)

On its face, then, OCGA § 48-4-5 requires notice to *the record owner of the property* and *the record owner of each security deed affecting the property*, among others,

11

and it requires that notice to *state that the excess funds are available for distribution to the owner or owners.* This language evinces a recognition that such "owners" have entitlement to excess funds.[5]

Furthermore, there are two categories of expressly recognized "owners." Without question, the first category of "owner," the original "record owner of the property" – in this case, Nelson – certainly qualifies as a title holder with rights to excess funds. That much is not disputed. But the plain wording of the statute indicates that the second category of "owner," the "record owner of each security deed," has some potential entitlement to excess funds as well. *Both* types of owners are expressly entitled to notice that indicates that "owners" are entitled to distribution of excess funds.

---

[5] We have previously noted that "OCGA § 48-4-5 does not create any substantive legal rights or somehow convert a lien against real property into one that may be satisfied from personal property. Instead, it requires notice and states the priority of payment for those who have an interest that may be satisfied from the excess funds." *Flat Creek Falls*, 369 Ga. App at 95. However, while OCGA § 48-4-5 does not create substantive rights, it nonetheless contains a recognition that substantive rights to excess funds flow from certain categories of ownership, as more fully discussed in the body of this opinion.

This makes logical sense when considering the nature of the interest held by the owner of a security deed. OCGA § 44-14-60 clarifies that the owner of a deed to secure debt holds actual *title* to any underlying property. This statute provides:

> Whenever any person in this state conveys any real property by deed to secure any debt to any person loaning or advancing the grantor any money or to secure any other debt and takes a bond for title back to the grantor upon the payment of the debt or debts or in like manner conveys any personal property by bill of sale and takes an obligation binding the person to whom the property is conveyed to reconvey the property upon the payment of the debt or debts, the conveyance of real or personal property *shall pass the title of the property to the grantee* until the debt or debts which the conveyance was made to secure shall be fully paid. *Such conveyance shall be held by the courts to be an absolute conveyance*, with the right reserved by the grantor to have the property reconveyed to him upon the payment of the debt or debts intended to be secured agreeably to the terms of the contract, and shall not be held to be a mortgage. No bond for title or to reconvey shall be necessary where the deed shows upon its face that it is given to secure a debt.

(Emphasis supplied.) Because a valid deed to secure debt passes title, it follows that the holder of that deed is also an "owner" of that property. It also makes sense, then, that OCGA § 48-4-5 uses the term "record *owner* of each security deed," thereby recognizing that deeds to secure debt pass title. Just like an original owner may claim *title* to the underlying property, so may the owner of a valid security deed. This fact creates the similar footing between the two types of owners in OCGA § 48-4-5, and

it triggers the need to notify them both that they may have entitlement to excess funds that "are available for distribution to the owner or owners[.]"

In contrast, as recognized in *DLT II* and *Flat Creek Falls*, a lien holder – at least the types of lien holders considered in those cases – does not have *title* to the tax sale property. To the contrary, most lien holders have an interest that may be enforced against the underlying real property, but it does not entail *ownership* of that property sufficient to trigger any entitlement to the excess funds under the language of OCGA § 48-4-5 .

> "OCGA § 48-4-5 simply does not contemplate the superior court's distribution of the excess funds to persons without an interest in the real property. See, e.g., *Bridges [v. Collins-Hooten*, 339 Ga. App. 756, 761 (1) (792 SE2d 721) (2016)] (where lienholder no longer retained a priority lien on the property, lienholder was not entitled to receipt of excess funds under OCGA § 48-4-5 (b)); *Worthwhile Investments, LLC v. Higgins*, 337 Ga. App. 183, 185 (787 SE2d 245) (2016) (appellant's right to the excess funds under OCGA § 48-4-5 was established at the time of the tax sale, at which time it "held an interest in the property"); see also *Performance Food Grp., Inc. v. Davis*, 346 Ga. App. 487, 491 (2) (816 SE2d 468) (2018) (because the Bank did not provide proof of an outstanding balance on the security deed for the property, the Bank failed to show that it had a valid priority interest in the excess funds under OCGA § 48-4-5 (b)). If we were to hold otherwise, we would effectively rewrite the statute, and that we cannot do. *Jackson v. Sluder*, 256 Ga. App. 812, 818 (2) (569 SE2d 893) (2002) ("Under the guise of construing a statute, we are not at liberty to rewrite it.") (citation omitted)."

14

*Denhardt v. Sparks*, 356 Ga. App. 63, 66 (844 SE2d 192) (2020) (footnote omitted).

In a similar manner, application of the holding in *Wellington* would require us to

rewrite OCGA § 48-4-5 in a way that would both omit the classification of a holder of

a deed to secure debt as an "owner" and overlook the title held by such deed holders

pursuant to OCGA § 44-14-60. That is something that we cannot do. *Sluder*, 256 Ga.

App. at 818 (2).

For all of these reasons, we decline to follow the holding of the federal court in

*Wellington*, and we reject Home Equity Credit's contention that the owner of a deed

to secure debt encumbering property sold at a tax sale has no right to excess funds

based on that deed.[6] For the same reasons, we find that the trial court did not err in its

determination that GHFA, as the record owner of a valid security deed, had

---

[6] We must caution that this opinion should not be interpreted as ruling that *only* owners and owners of security deeds are entitled to excess funds. The language of OCGA § 48-4-5 indicates that is not the case – notice under subsection (a) must be given to "other parties having any recorded equity interest or claim in such property at the time of the tax sale[,]" and, under subsection (b), "excess funds shall be distributed by the superior court to the *intended parties, including the owner*, as their interests appear and in the order of priority in which their interests exist." (Emphasis supplied). Deciding the current matter, however, does not require us to create an exhaustive list of "intended parties" who may be entitled to excess funds under the statute.

entitlement to excess funds.[7] But our analysis cannot stop there with regard to NewRez, as Home Equity Credit has raised a second argument that, even if a security deed holder has a right to excess funds, NewRez wholly failed to prove that it was such a holder. We find this second argument compelling, and we consider it in the following division.

2. The record shows that, as the stated rationale for its entitlement to the excess funds, NewRez, in its interpleader claim, posits the following: (1) "[NewRez] is the former loan servicer for Freddie Mac[;]" (2) "Freddie Mac has a first priority security title interest against the Property. See Title Report attached to [Sheriff's] Petition[;]" and (3) "[NewRez] paid the redemption price of $528,000.00." Later, at the interpleader hearing, NewRez also contended that it was entitled to excess funds because it "had an interest . . . at the time of the tax sale."

Throughout the proceedings of this case, however, NewRez made almost no effort to prove the existence of any of these purported facts on which it premised its

---

[7] Unlike NewRez, GHFA entered into the record its deed to secure debt encumbering Nelson's property.

right to the excess funds, other than the payment of the redemption price.[8] NewRez admits that the appellate record does not contain the original mortgage agreement, the associated deed to secure debt, the assignment of the deed to secure debt to NewRez, the assignment of the deed to secure debt to some subsequent holders, or any servicing agreement between NewRez and Freddie Mac authorizing NewRez to collect excess funds representing the full payoff of the mortgage. Instead of providing any of this *pivotal* evidence, NewRez argued at the interpleader hearing that all of the necessary documents required for its claim were public records, essentially inviting the trial court to find the evidence, itself, or take judicial notice that these documents existed despite having no opportunity to review their terms.[9] In the alternative, NewRez argued that evidence of its rights could be cobbled together from filings of other parties. For example, NewRez maintained that the deed to secure debt through which it claimed authority was listed in a title search attached to the Sheriff's petition

---

[8] Although, even with regard to this fact, testimony indicated that Corelogic paid this sum on NewRez's behalf.

[9] With regard to the deed to secure debt, NewRez's counsel made the excuse: "I though we attached it, but if we didn't, we certainly cited deed book and page, and we would ask the court to take judicial notice. It's in the public records, your honor." The trial court made no ruling on the request to take judicial notice.

for interpleader and was also listed as a senior indebtedness on the deed to secure debt held by GHFA (which GHFA did place into evidence). But none of this provides *sufficient* evidence of NewRez's deed to secure debt or any of its potential terms or restrictions.[10] And there is no evidence *at all* of NewRez's relationship to Freddie Mac, through which NewRez purportedly claims the entirety of the payoff amount for the loan.

At the interpleader hearing, NewRez called a single witness – Angela McGuire, counsel for Corelogic, a "tax service payment provider" for NewRez. According to McGuire, Corelogic redeemed the property on behalf of NewRez, and NewRez was the servicer for Freddie Mac. She further testified, however, that, though she had seen a mortgage agreement associated with the redeemed property, she could not remember any of its terms, and she did not have a copy of that mortgage with her. She also testified that she could not remember if she had ever seen a deed to secure debt relating to the property. McGuire did testify that the full balance owing on the loan

_____

[10] The record does contain a mortgage modification agreement between Nelson and Shellpoint Servicing dated October 29, 2018, and a servicing transfer letter from Shellpoint Servicing to Nelson dated June 16, 2022. These documents, however, do not fill in the necessary blanks to prove the existence or terms of a deed to secure debt or that NewRez has some, or *any*, authority to pursue excess funds on behalf of Freddie Mac.

was $276,763.71 based on a statement that had been provided to her in an email from someone at NewRez. But, McGuire did not know anything about NewRez's assignment of rights to or from Freddie Mac or whether NewRez was claiming the full payoff balance for itself or whether NewRez was claiming all or some portion for Freddie Mac. So, ultimately, McGuire provided almost no information supporting NewRez's claim to excess funds.

We have previously recognized that "there is little case law regarding the burden of proof related to remaining lien interests in interpleader actions[.]" *Performance Food Group*, 346 Ga. App. at 491 (2) ("The Bank was required to show that it had a valid priority interest in the excess funds, and because it failed to provide proof of an outstanding balance, we must reverse the grant of summary judgment."). Here, NewRez's "bare statements" of its interest in the underlying property, its relationship to Freddie Mac, and its entitlement to the entire payoff balance of the loan are simply not enough to establish its right to any certain amount of excess funds. To hold otherwise would create an interpleader process in which a claimant had virtually no evidentiary burden at all to prove an enforceable interest. It could just express entitlement and shift its burden of proof to the trial court, requiring the court

19

to scour public records for the claimant's benefit. We will not espouse such a procedure. The burden of proof lies with the party claiming an interest, not the trial court. Id.

Accordingly, because NewRez failed to shoulder its burden of proving an enforceable interest in excess funds, the trial court's award to NewRez must be reversed.[11]

*Judgment affirmed in part and reversed in part. Dillard, P. J., and Land, J., concur.*

---

[11] Given this holding, we need not consider Home Equity Credit's remaining contentions.